# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|   |   |
|---|---|
| ROBERT WAINBLAT, for himself and all others similarly situated, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civil Action No. ) 19-10976-FDS ) |
| COMCAST CABLE COMMUNICATIONS, LLC, et al., | ) ) ) ) |
| Defendants. | ) ) ) |

## MEMORANDUM AND ORDER
## ON DEFENDANT'S MOTION TO COMPEL ARBITRATION

**SAYLOR, J.**

This action involves a cable subscriber's claims of violations of his statutory right to privacy. Plaintiff Robert Wainblat alleges that defendant Comcast Cable Communications, LLC has violated his rights as a cable television subscriber under federal and Massachusetts laws. He also asserts class allegations on behalf of similarly situated individuals.

Comcast has moved to compel arbitration pursuant the terms of an arbitration provision contained within the subscriber agreement between the parties. For the reasons set forth below, the motion will be granted.

## I. Background

### A. Factual Allegations of the Complaint

Robert Wainblat is a Massachusetts resident. He alleges that he has been a subscriber of the cable television services of Comcast Cable Communications, LLC since approximately

September 2013.  (Compl. ¶ 4).

The complaint alleges that Comcast deploys a "two-way cable-network" to deliver targeted advertisements in violation of the Cable Communications Policy Act of 1984 ("CCPA"), 47 U.S.C. § 521, *et seq.*  (Compl. ¶ 10).  The alleged data collection includes information such as customer viewing history, income, ethnicity, education, and product-consumption habits, some of which may be acquired from third parties.  (*Id.* ¶ 10-12).  Comcast allegedly uses that data in conjunction with data from subscriber Internet usage to sell high-value targeted ads through Comcast Spotlight, its advertising arm.  (*Id.* ¶ 13-14).  The complaint further alleges that Comcast uses this data to "blast" subscribers with ads across multiple interfaces and media.  (*Id.* ¶ 15).

The complaint alleges that those data collection and usage activities employ "personally identifiable information" as defined by 47 U.S.C. § 551(a)(2)(A).  (*Id.* ¶ 16-20).  It further alleges that those activities, in conjunction with Comcast's opt-out data-collection consent practices, violate the CCPA.  (*Id.* ¶ 21 –25).  That statute, in addition to establishing a framework for cable competition and ownership, creates various substantive rights concerning cable-subscriber privacy.  *See* 47 U.S.C. § 551.  Those rights include, among others, the right not to have personally identifiable information collected or disseminated without prior written or electronic consent and certain rights of access and notice of personally identifiable information collected by a cable service provider.  *Id.* at § 551 (b)–(d).

The complaint also asserts claims under Massachusetts General Laws Chapter 93A.  Specifically, it alleges that Comcast's failure to provide "clear and conspicuous disclosures" regarding its information sharing practices constitutes an unfair and deceptive act and practice in violation of Chapter 93A.  (Compl. ¶ 25).

## 1. The Parties' Contractual Relationship

Wainblat first subscribed to Comcast cable television services for his residence in Boston beginning on August 26, 2013. (Def. Mot. Compel Arb. 3; *see also* Compl. ¶ 26). At the time of that first installation, he received a "Welcome Kit" that included copies of a Privacy Notice and a Subscriber Agreement, which contained an arbitration clause. (D. Mot. Compel Arb. 3).

In October 2016, Wainblat self-installed Comcast services under a new account at a new address. (*Id.*). Included in the self-install kit were copies of the then-current Subscriber Agreement and Privacy Notice. (*Id.*).

In August 2017, Comcast inserted a revised Subscriber Agreement (the "2017 Subscriber Agreement) into Wainblat's Comcast bill. (*Id.*). According to the terms of the 2017 Subscriber Agreement, Wainblat accepted the revised agreement through continued receipt of Comcast services. (*Id.* at 4).

The 2017 Subscriber Agreement contained an arbitration provision (the "Arbitration Provision"). It covers

> any claim or controversy related to [Comcast] or our relationship, including but not limited to any and all: (1) claims for relief and theories of liability, whether based in contract, tort, fraud, negligence, statute, regulation, ordinance, or otherwise; (2) claims that arose before this or any prior Agreement; (3) claims that arise after the expiration or termination of this Agreement, and (4) claims that are the subject of purported class action litigation.

(2017 Subscriber Agreement § 13 (b)). The Arbitration Provision included a "Right to Opt Out," which could be exercised online or by mail within 30 days of the initiation of services. (*Id.* § 13(d)). Wainblat does not dispute that he did not exercise this right. (*See* D. Mot. Compel 6).

The Arbitration Provision outlines procedures for dealing with claims. Claims brought against Comcast that are covered by the Arbitration Agreement

> shall be governed by the Federal Arbitration Act. Arbitrations shall be

> administered by the AAA pursuant to its Consumer Arbitration Rules . . . as
> modified by the version of the Arbitration Provision that is in effect when notify
> us about your Dispute.

(2017 Subscriber Agreement § 13(g)). If the AAA Consumer Arbitration Rules conflict with the Arbitration Provision, the "Arbitration Provision shall govern." (*Id.*).

Comcast retained a unilateral right to modify the Subscriber Agreement and other aspects of the subscriber relationship. Specifically, the notice of change provision of the Subscriber Agreement stated as follows:

> We [Comcast] may deliver any notice concerning our relationship with you, including notice of any change to this Agreement, in any one or more of the following ways, as determined in our discretion: (1) by posting on www.xfinity.com or any other website about which you have been notified; (2) by mail or hand delivery to your Premises; (3) by e-mail to the address for your account in our records; or (4) by including it on or with your bill for Service(s) You agree that any one of the foregoing will constitute sufficient and effective notice under this Agreement. . . . If you find any change to this Agreement to be unacceptable, you have the right to cancel your Service(s). Your continued receipt of the Service(s) for more than 30 days after we deliver notice of the change, however, will constitute your acceptance of the change.

(*Id.* § 16).

### B. Procedural Background

Plaintiff filed the complaint in this action on April 25, 2019, asserting claims for violations of 47 U.S.C. § 521 *et. seq.* and Mass. Gen. Laws ch. 93A, §§ 2 and 9. (Compl. ¶ 1). In addition to naming Comcast as a defendant, the complaint purports to assert claims against "John Does 1-50."[1]

Comcast has moved to compel arbitration pursuant to the Arbitration Provision in the Subscriber Agreement.

---

[1] The complaint does not state who the "John Does" are, why they are included in the case, or what, if any, relationship they have to the allegations.

## II. Legal Standard

The Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, governs the enforcement of written arbitration agreements implicating interstate commerce. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001) (holding that the FAA extends to employment cases for employees other than those engaged in transportation of goods). "Congress enacted the FAA in response to widespread judicial hostility to arbitration." *American Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 232 (2013) (citing *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)). Section 2 is the "primary substantive provision of the Act." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). It provides, in relevant part, as follows:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

The Supreme Court has "described this provision as reflecting both a 'liberal federal policy favoring arbitration,' and the 'fundamental principle that arbitration is a matter of contract.'" *Concepcion*, 563 U.S. at 339 (quoting *Moses H. Cone*, 460 U.S. at 24; *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010)). In line with those principles, "courts must place arbitration agreements on an equal footing with other contracts." *Id.* They must also "'rigorously enforce' arbitration agreements according to their terms." *Italian Colors Rest.*, 570 U.S. at 233 (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221 (1985)).

"The final phrase of § 2, however, permits arbitration agreements to be declared unenforceable 'upon such grounds as exist at law or in equity for the revocation of any contract.'" *Concepcion*, 563 U.S. at 339 (quoting 9 U.S.C. § 2). That clause allows arbitration agreements to be invalidated by "'generally applicable contract defenses, such as fraud, duress,

5

or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Id.* (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)). Furthermore, the FAA's requirement that arbitration agreements be enforced according to their terms "holds true for claims that allege a violation of a federal statute, unless the FAA's mandate has been 'overridden by a contrary congressional command.'" *Italian Colors Rest.*, 570 U.S. at 233 (quoting *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012)).

In short, arbitration agreements that are validly formed under state contract law must be enforced according to their terms under Section 2 of the FAA, unless one of two exceptions applies. First, an arbitration agreement may be invalidated on any ground that would make a contract unenforceable, such as unconscionability or illegality. *Concepcion*, 563 U.S. at 339. Second, the application of the FAA may be precluded by another federal statute's contrary command. *CompuCredit*, 565 U.S. at 98.

"A party who is seeking to compel arbitration must demonstrate that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope." *Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino*, 640 F.3d 471, 474 (1st Cir. 2011). (citation and internal quotation marks omitted). "Whether or not a dispute is arbitrable is typically a question for judicial determination." *Dialysis Access Ctr., LLC v. RMS Lifeline, Inc.*, 638 F.3d 367, 375 (1st Cir. 2011). "Therefore, 'except where the parties clearly and unmistakably provide otherwise, it is the court's duty to interpret the agreement and to determine whether the parties intended to arbitrate grievances concerning a particular matter.'" *Id.* (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 301 (2010)).

6

When an enforceable arbitration agreement exists between the parties, a court may enforce that agreement by staying existing litigation pending arbitration, 9 U.S.C. § 3, or compelling the parties to arbitrate and dismissing the action, 9 U.S.C. § 4. *See DeLuca v. Bear Stearns & Co.*, 175 F. Supp. 2d 102, 106-07 (D. Mass. 2001).

### III. Analysis

Comcast seeks to enforce the arbitration clause. The only real dispute concerns whether a "valid agreement to arbitrate exists." *See Soto-Fonalledas*, 640 F.3d at 474. Plaintiff contends that the clause is unenforceable because Comcast can modify the agreement at any time, and therefore its obligations under the agreement are "illusory." *See National Federation of the Blind v. The Container Store, Inc.*, 904 F.3d 70, 85 (1st Cir. 2018).

A unilateral right to modify an arbitration provision can render it unenforceable. In *National Federation*, the First Circuit declined to enforce an arbitration provision on the ground that the arbitration agreement was an "illusory" promise on the part of the defendant. 904 F.3d at 85. "[W]here one party to an arbitration agreement seeks to invoke arbitration to settle a dispute, if the other party has the right to change the terms of the agreement to avoid arbitration, then the agreement was illusory from the outset." *Id.* at 86 (citing 3 WILLISTON ON CONTRACTS § 7:11 (4th ed. 2018)). The key question was "whether the [enforcing party] has the power to make changes to its arbitration policy that have retroactive effect, meaning changes to the policy that would strip the right of arbitration from a party who *has already attempted to invoke it*." *Id.* (emphasis added).[2]

Similarly, in *McNamara v. S.I. Logistics, Inc.*, WL 6573125, *4 (D. Mass., Dec. 13,

---

[2] The court was applying Texas law, but "[c]ourts have applied similar reasoning to find arbitration agreements illusory under Massachusetts law." *McNamara v. S.I. Logistics, Inc.*, WL 6573125, *4 (D. Mass., Dec. 13, 2018).

7

2018), the court was faced with an arbitration agreement under which the enforcing party could "amend or terminate . . . the arbitration provision, even if it had previously received notice of an existing arbitration dispute." Applying *National Federation*, the court found the arbitration provision of the contract to be predicated on an illusory promise from the enforcing party. *Id.*

Here, Comcast's ability to modify the agreement is not so unlimited. The 2017 Subscriber Agreement provides that "[a]rbitrations shall be administered by the AAA pursuant to its Consumer Arbitration Rule . . . as modified by the version of this Arbitration Provision that is in effect when you notify [Comcast] about your dispute." (2017 Subscriber Agreement § 13(g)). That language does not give Comcast unfettered ability to modify the Arbitration Provision as applied to a pending matter; a consumer can lock in the then-current arbitration terms simply by giving notice of a dispute. Furthermore, the notice-of-changes provision empowers subscribers to reject "any" change to the Subscriber Agreement and gives them 30 days to make that decision. (2017 Subscriber Agreement § 16). By comparison, the defendants in *National Federation* and *McNamara* could modify their obligations under the relevant arbitration agreements at any time.

Plaintiff's efforts to distinguish the *National Federation* are unpersuasive. He argues that Comcast could alter the Arbitration Provision if it became aware of a possible subscriber claim, as long as such a claim had not yet been filed. (*See* P. Sur-Reply Opp. 5). But that possibility is not fatal to the agreement. Because subscribers can reject changes to their agreements within 30 days of being provided notice of the change, a subscriber who had accrued—but not commenced—a claim could reject an unfavorable amendment and preserve the terms of the contract as they were at the time of claim accrual.

Finally, plaintiff contends that Comcast has the power to change the arbitration

provisions after *it* (as opposed to a subscriber) initiates a dispute. The contract is arguably ambiguous on that point. (2017 Subscriber Agreement § 13(g)) ("Arbitrations shall be administered by the AAA pursuant to its Consumer Arbitration Rule . . . as modified by the version of this Arbitration Provision that is in effect when *you* notify [Comcast] about your dispute" (emphasis added)). But that potential ambiguity is likewise not fatal.

To begin, that is a hypothetical scenario, which did not occur in this case. Furthermore, that interpretation would be unreasonable in the context of the larger agreement. (*See e.g., id.* § 13(a) ("Any dispute involving you and us shall be resolved through individual arbitration.")). As a matter of generally accepted contract interpretation principles—particularly the principles of applying plain meaning and preferring reasonable interpretations that find validity—it is likely that such an interpretation would be rejected. *See* 11 WILLISTON ON CONTRACTS § 31:3 (4th ed. 2019) ("[N]ormal meaning of language will be given to the words of a contract unless the circumstances show that in a particular case a special meaning should be attached to them"); *id.* at § 31:11 ("[I]nterpretations which render the contract valid . . . are preferred to those which render it invalid . . . [and] interpretations which render the contract fair and reasonable are preferred to those which render the contract harsh or unreasonable to one party."). There is certainly no reason to impose a strained interpretation of the contract, as applied to a purely hypothetical set of facts, in order to find that the arbitration agreement is invalid.

In short, because Comcast's obligations under the Arbitration Provision were not "illusory," the Arbitration Provision is valid and enforceable. For that reason, defendant's motion to compel arbitration will be granted.

## IV. Conclusion

For the reasons stated above, the motion of Comcast Cable Communications, LLC to

9

compel arbitration of the claims against it is GRANTED.  Further litigation of any claims against Comcast Cable Communications, LLC is hereby STAYED pending the conclusion of arbitration.

**So Ordered.**

Dated:  November 4, 2019

F. Dennis Saylor IV  
F. Dennis Saylor IV  
United States District Judge